PER CURIAM Opinion; Dissent by Judge CALLAHAN.
OPINION
PER CURIAM:
Eddie Ford (“Ford”) appeals from the grant of summary judgment in favor of the City of Yakima and two of its police officers, Ryan Urlacher and Nolan Wentz (“Appellees”), in his 42 U.S.C. § 1983 action alleging First Amendment retaliation.
Ford has alleged facts that would establish a violation of his clearly established First Amendment right to be free from police action motivated by retaliatory animus, even if probable cause existed for that action. See Skoog v. County of Clackamas, 469 F.3d 1221, 1235 (9th Cir.2006). Because the officers are not entitled to qualified immunity, we reverse and remand for trial.
I. Background
Shortly after midnight on July 17, 2007, Ford was listening to music while driving to work when he noticed a police car approaching rapidly from behind him. Ford changed lanes twice “to get out of [the police car’s] way.” The patrol ear followed him each time. While stopped at a red light, Ford stepped out of his car abruptly and asked Urlacher, the officer driving the police car, why he was being followed so closely. Urlacher felt “concerned for [his] safety,” and told Ford to get back into the car and “go.” Then, as both parties drove through the intersection, Urlacher turned on his flashing lights and initiated a traffic stop.
Ford turned into a nearby parking area and emerged from his car yelling. Urlacher, armed with a taser gun, approached Ford and asked for his license and registration. Urlacher perceived the situation as “very dangerous.” As Ford retrieved the requested items, he stated that he thought the traffic stop was racially motivated. Urlacher warned Ford to stay in the car or risk being taken to jail. Ford obeyed.
Urlacher then returned to his patrol car and checked Ford’s driver’s license for warrants. While doing so, he told another officer, “I think I’m going to arrest him for [a] city noise ordinance violation right now. He might only get a ticket if he cooperates. But with that attitude, he’s going to get cuffed.” The officer then returned to Ford’s car and, with the assistance of a backup officer, handcuffed Ford.
An exchange then ensued in which Urlacher stated: (1) “Stop running the mouth and listen”; (2) “If you talk over me, you are going to go to jail, sir. Do not talk over me”; (3) “If you cooperate, I may let you go with a ticket today. If you run *1191 your mouth, I will book you in jail for it. Yes, I will, and I will tow your car”; (4) “If you cooperate and shut your mouth, I’ll give you a ticket and you can go.”
Ford responded with disbelief to the prospect of being taken to jail for a noise violation, but after repeated threats that he would be jailed if he kept talking, Ford stopped yelling and answered the officer’s questions with responses such as “Uh-huh” and “You do what you want.” When Ford expressed concern about getting to work, Urlacher replied:
Well that’s not going to happen if you don’t — if you keep running your mouth. Okay? If you have diarrhea of the mouth, you will go to jail. If you cooperate with us and treat us like human beings, we will treat you like a human being. Do you understand me?
Ford said nothing further.
Once Ford was in the back of Urlacher’s patrol car and out of earshot, Urlacher told a backup officer, “I don’t know if I’m going to book him yet. I’ll see if he’s going to shut up.” At that point, Lieutenant Wentz arrived on the scene. Urlacher recounted the incident to Wentz and explained, “So he’s under arrest for the city ordinance right now. If he shuts up, I’ll let him go with a ticket.” Wentz stated that Ford had a “hot head” and was “getting worse over time.” Wentz advised, “I would not just write [Ford] a ticket and let him go ... I’d sign his ass up.” Urlacher agreed and took Ford to jail.
When driving to the booking facility, Ford asked why he was being taken to jail. Urlacher told him that it was because he was playing his music too loud and because he “acted a fool.” Urlacher elaborated:
If you would have acted like a human being towards me, I would have treated you like a human being. I probably would have, you know — but you talked yourself into this on video. It’s all well recorded.
Ford invoked his right to free speech. Urlacher replied:
I have the freedom to take you to jail, too. And that’s what’s going to happen. ... You exercise [your freedom of speech] all you want, okay? If you just cooperate and treat the police like humans, we’ll treat you like that. But when you act like that, like an animal, you’ve got to get treated that way, you know.
You’re going to jail for numerous reasons. The crime you’re going to jail for is the city noise ordinance. A lot of times we tend to cite and release people for that or we give warnings. However ... you acted a fool ... and we have discretion whether we can book or release you. You talked yourself — -your mouth and your attitude talked you into jail. Yes, it did.
Urlacher later testified that he booked Ford (1) because he violated the city noise ordinance, which gives him discretion to book a person “if I feel like it,” and (2) because he “failed to listen[,] ... failed to act civil, ... failed to take responsibility for his actions, [and because of] his rageful [and disrespectful] behavior towards the law enforcement,” which put public safety at risk.
Ford was prosecuted for violating the City of Yakima’s noise ordinance. Yakima Municipal Code 6.04.180. The municipal court acquitted Ford of the charged offense.
Ford filed an action for civil damages against Appellees pursuant to 42 U.S.C. § 1983. Ford alleged, inter alia, that the police officers retaliated against him for exercising his First Amendment right to freedom of speech. Appellees moved for summary judgment on all claims. Ford moved for partial summary judgment against the officers, alleging that qualified immunity did not shield them from liability.
*1192 The district court granted summary judgment to Appellees and denied Ford’s motion for partial summary judgment. In so doing, the court found that the officers did not retaliate against Ford in violation of the First Amendment because they had probable cause to arrest Ford for violating the city noise ordinance. In addition, “the totality of the circumstances, including the manner in which [Ford] confronted Officer Urlacher and delivered his criticism, and not merely the criticism itself, led Officer Urlacher to reasonably conclude booking was warranted.” The district court determined that “no rational jury could conclude Plaintiffs exercise of his right of free speech was the ‘but for cause’ of his booking.” Because the court ruled as a matter of law that there was no constitutional violation, it did not reach the issue of qualified immunity.
Ford appeals the district court’s grant of summary judgment in favor of the officers on his First Amendment claim.
II. Jurisdiction and Standard of Review
We have jurisdiction pursuant to 28 U.S.C. § 1291. We review de novo a district court’s ruling on cross-motions for summary judgment, including rulings based on qualified immunity. CRM Collateral II, Inc. v. TriCounty Metro. Transp. Dist., 669 F.3d 963, 968 (9th Cir. 2012). ‘We view the evidence in the light most favorable to the nonmoving party and determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law.” Id. at 968 (internal quotation marks and citation omitted). The parties’ assertions that there are no disputed issues “does not vitiate the court’s responsibility to determine whether disputed issues of material fact are present. A summary judgment cannot be granted if a genuine issue as to any material fact exists.” Fair Hous. Council v. Riverside Two, 249 F.3d 1132, 1136 (9th Cir.2001) (quoting United States v. Fred A. Arnold, Inc., 573 F.2d 605, 606 (9th Cir.1978)).
III. Discussion
Qualified immunity protects officers from liability for civil damages where their alleged unconstitutional conduct does not violate a clearly established right. Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). “Qualified immunity balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.” Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).
An officer is entitled to qualified immunity unless (1) facts viewed in the light most favorable to the injured party show that the officer violated a constitutional right and (2) the right was clearly established at the time of the alleged misconduct. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), modified by Pearson, 555 U.S. at 233, 129 S.Ct. 808.
A. Constitutional Violation
The first issue is whether the facts viewed in the light most favorable to Ford show a violation of his rights. “[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers.” City of Houston v. Hill, 482 U.S. 451, 461, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987). While an individual’s critical comments may be “provocative and challenging,” they are “nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above *1193 public inconvenience, annoyance, or unrest.” Id. (quoting Terminiello v. City of Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949)). In fact, “[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state.” Id. at 462-63, 107 S.Ct. 2502.
In this Circuit, an individual has a right “to be free from police action motivated by retaliatory animus but for which there was probable cause.” Skoog, 469 F.3d at 1235. That right was violated when the officers booked and jailed Ford in retaliation for his protected speech, even though probable cause existed for his initial arrest. Ford’s criticism of the police for what he perceived to be an unlawful and racially motivated traffic stop falls “squarely within the protective umbrella of the First Amendment and any action to punish or deter such speech ... is categorically prohibited by the Constitution.” Duran v. City of Douglas, 904 F.2d 1372, 1378 (9th Cir.1990).[1]
 In order to establish a claim of retaliation in violation of the First Amendment, Ford’s evidence must demonstrate that the officers’ conduct would chill a person of ordinary firmness from future First Amendment activity. See Skoog, 469 F.3d at 1231-32. In addition, the evidence must enable Ford ultimately to prove that the officers’ desire to chill his speech was a but-for cause of their allegedly unlawful conduct. See Lacey v. Maricopa County, 693 F.3d 896, 916-17 (9th Cir.2012) (en banc).
1. Chilled Speech
Ford has set forth sufficient evidence to demonstrate that the officers’ “acts would chill or silence a person of ordinary firmness from future First Amendment activities.” Mendocino Envtl. Ctr. v. Mendocino Cnty., 192 F.3d 1283, 1300 (9th Cir.1999) (citation omitted). He has alleged that he was booked and jailed in retaliation for his speech. This Court has recognized that a retaliatory police action such as an arrest or search and seizure would chill a person of ordinary firmness from engaging in future First Amendment activity. See Lacey, 693 F.3d at 917 (retaliatory arrest); Skoog, 469 F.3d at 1232 (retaliatory search and seizure); *1194 see also White v. Lee, 227 F.3d 1214, 1228 (9th Cir.2000) (holding that informal measures such as an investigation can chill First Amendment activities). Likewise, a person of ordinary firmness would be chilled from future exercise of his First Amendment rights if he were booked and taken to jail in retaliation for his speech. Therefore, a rational jury could find that the officers deterred or chilled the future exercise of Ford’s First Amendment rights.
2. Causation
To satisfy the second requirement, the evidence must be sufficient to establish that the officers’ desire to chill Ford’s speech was a but-for cause of their conduct. In other words, would Ford have been booked and jailed, rather than cited and arrested, but for the officers’ desire to punish Ford for his speech?
Under Washington law, a police officer who has probable cause may arrest an individual without a warrant if that individual commits a misdemeanor in the presence of that officer. ROW 10.31.100. When a person is arrested for a traffic violation, the arresting officer may not detain him for a period of time longer than is necessary to issue and serve a citation and a notice to appear in court. RCW 46.64.015. Upon arresting an individual for a misdemeanor, a police officer has discretion under Washington Criminal Rules for Courts of Limited Jurisdiction (“CrRLJ”) to hold an individual in custody based on a limited number of factors, including “whether detention appears reasonably necessary to prevent imminent bodily harm to [the individual] or another, or injury to property, or breach of the peace.” CrRLJ 2.1(b)(2)(ii).
Ford does not contend that police officers lacked probable cause to arrest him for violating the city noise ordinance. But Officer Urlacher’s probable cause to arrest Ford does not necessarily mean that booking and jailing him was constitutional.[2] The only permissible non-retaliatory bases on which Officer Urlacher may have booked Ford are contained in CrRLJ 2.1(b)(2), and the officers have argued and presented evidence that their decision to book and jail Ford was based on that provision.
While the issue of causation ultimately should be determined by a trier of fact, Ford has provided sufficient evidence for a jury to find that the officers’ retaliatory motive was a but-for cause of their action, thus satisfying the causation element of a First Amendment retaliation claim for the purposes of qualified immunity.[3] Cf. Du *1195 ran, 904 F.2d at 1378 (finding summary judgment inappropriate where the officer admitted to stopping the plaintiff because the plaintiff made obscene gestures and yelled profanities but claimed he had no retaliatory motive because he honestly believed criminal activity might be afoot); Mendocino Envtl. Ctr., 192 F.3d at 1303 (“The possibility that other inferences could be drawn [regarding the officers’ motivations] that would provide an alternate explanation for the appellants’ actions does not entitle them to summary judgment.”). Taken in the light most favorable to Ford, the facts establish that the officers’ alleged conduct violated his right to be free from police action motivated by retaliatory animus, even if probable cause existed for that action.
B. Clearly Established Right
The officers are nevertheless entitled to qualified immunity if Ford’s right was not clearly established when the officers booked and jailed him.
Whether a right is clearly established for the purposes of qualified immunity “depends substantially upon the level of generality at which the relevant ‘legal rule’ is to be identified.” Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The right must not be stated as a broad general proposition, but rather must be defined with enough specificity to put a reasonable officer on notice that his conduct is unlawful. Reichle v. Howards, — U.S. -, 132 S.Ct. 2088, 2093-94, 182 L.Ed.2d 985 (2012); cf. Hope, 536 U.S. at 741, 122 S.Ct. 2508 (holding that “general statements of the law are not inherently incapable of giving fair and clear warning” to officers even where their specific conduct has not previously been held unlawful) (quoting United States v. Lanier, 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)). A right can be clearly established despite a lack of factually analogous preexisting case law, and officers can be on notice that their conduct is unlawful even in novel factual circumstances. See Karl v. City of Mountlake Terrace, 678 F.3d 1062, 1073 (9th Cir.2012). The relevant inquiry is whether, at the time of the officers’ action, the state of the law gave the officers fair warning that their conduct was unconstitutional. Hope, 536 U.S. at 741, 122 S.Ct. 2508. We must assess the legal rule “in light of the specific context of the case, not as a broad general proposition.” Saucier, 533 U.S. at 201, 121 S.Ct. 2151.
At the time the officers acted in 2007, the law in this Circuit gave fair notice that it would be unlawful to jail Ford in retaliation for his First Amendment activity. Police officers have been on notice at least since 1990 that it is unlawful to use their authority to retaliate against individuals for their protected speech. See Duran, 904 F.2d at 1375-78 (holding that a police officer’s traffic stop and subsequent arrest of an individual who directed obscene gestures and words toward that officer was unlawful because it was well-established that police officers may not exercise their authority for personal motives, especially in response to an individual’s criticism or insults); see also Beck v. City of Upland, 527 F.3d 853, 871 (9th Cir.2008) (holding that Duran clearly established that police officers could not use their power to retaliate against an individual for his free speech). Moreover, this Court’s 2006 decision in Skoog established that an individual has a right to be free from retaliatory police action, even if probable cause exist *1196 ed for that action. 469 F.3d at 1235. In that case, Skoog claimed that a police officer seized his property to retaliate against his filing a lawsuit against another officer. Id. at 1227. We held that although the officer’s search and seizure was supported by probable cause, it was unlawful because the officer’s primary motivation was to retaliate against Skoog’s exercise of his First Amendment rights. Id. at 1235.
Thus, Duran clearly established that police officers may not use their authority to punish an individual for exercising his First Amendment rights, while Skoog clearly established that a police action motivated by retaliatory animus was unlawful, even if probable cause existed for that action. The officers’ conduct in this case falls squarely within the prohibitions of Duran and Skoog. While the precise issue of retaliatory booking and jailing has not been addressed in this Circuit, “closely analogous preexisting case law is not required to show that a right was clearly established.” Robinson v. York, 566 F.3d 817, 826 (9th Cir.2009) (citation omitted). Duran addressed a retaliatory arrest and Skoog applied to a retaliatory search and seizure, but the unlawfulness of a retaliatory booking and jailing was nevertheless apparent from those eases. After Duran, any reasonable police officer would have known that it was unlawful to use his authority to retaliate against an individual because of his speech. Likewise, any reasonable police officer would have understood that Skoog’s prohibition on retaliatory police action extended to typical police actions such as booking and jailing. Therefore, this case involved the kind of “mere application of settled law to a new factual permutation” in which we assume an officer had notice that his conduct was unlawful. See Eng v. Cooley, 552 F.3d 1062, 1076 (9th Cir.2009) (quoting Porter v. Bowen, 496 F.3d 1009, 1026 (9th Cir.2007)).
A reasonable officer would have understood that he did not automatically possess the authority to book and jail an individual upon conducting a lawful arrest supported by probable cause. Washington law clearly enumerates the limited factors that would allow a police officer to book and jail an individual who has been arrested for a misdemeanor. CrRLJ 2.1(b)(2). A reasonable officer would have been aware of the law governing his ability to book and jail an individual he lawfully has arrested. Moreover, a reasonable officer would have been aware that Washington law explicitly states that its rules “shall not be construed to affect or derogate from the constitutional rights of any defendant.” CrRLJ 1.1. Thus, a reasonable police officer would have understood that he could not exercise his discretion to book an individual in retaliation for that individual’s First Amendment activity. Finally, Officer Urlacher’s statements indicate that he was, in fact, aware of his discretion to book an individual he has arrested: “I have the freedom to take you to jail ... we have discretion whether we can book or release you.” He surely was aware that his discretion was subject to constitutional limits. Because the law concerning the right in question was clearly established at the time of Ford’s arrest, the officers are not entitled to qualified immunity.
IV. Conclusion
Ford has put forth facts sufficient to allege a violation of his clearly established First Amendment right to be free from police action motivated by retaliatory animus, even if probable cause existed for that action. Thus, the officers are not entitled to qualified immunity, and Ford’s claims should proceed to trial.
REVERSED and REMANDED.

. The dissent premises its view in part on the argument that individuals detained by the police enjoy less First Amendment protection than nondetainees. Dissent at 1197-98 (citing cases that discuss the diminished constitutional rights of prison inmates and jailed arrestees). Even if we believed that the law supported such a view, which we emphatically do not, the facts here make it doubtful that Ford's ostensibly attenuated rights would be relevant to the officers' liability. Although the dissent does not describe with specificity which constitutional rights are abrogated and which are retained when the police detain someone on a public street, it offers some hints. For instance, the dissent suggests that the detainee’s rights might need to give way to "the officer's need to determine [the detainee’s] dangerousness and proclivity to commit further breaches of the peace." Dissent at 1198. But nothing that Ford said following his detention gave any indication that he posed a danger to himself, the officers or property, or that he was likely to further disturb the peace. The dissent additionally proposes that the First Amendment’s scope is narrowed, in the context of a detention, by the fact that officers are “required to consider some statements by a detained person such as those relating to medical condition, health, fear of assault from others, and threats.” Dissent at 1204. The record makes plain, however, that nothing Ford said related to any of these things. And to the extent that there are any disputed issues of fact regarding the content of Ford's statements, or the relationship between those statements and the officers' alleged retaliatory animus, their resolution is for the trier of fact.

. Probable cause is not irrelevant to an individual’s claim that he was booked and jailed in retaliation for his speech. Probable cause for the initial arrest can be evidence of a police officer's lack of retaliatory animus for subsequently booking and jailing an individual. See Dietrich v. John Ascuaga’s Nugget, 548 F.3d 892, 901 (9th Cir.2008) (holding that the issue of probable cause is not dispositive of ordinary retaliation claims, though it still has "high probative force”) (alteration and quotation marks omitted). However, that determination should be left to the trier of fact once a plaintiff has produced evidence that the officer's conduct was motivated by retaliatory animus.

. In considering causation, the dissent asks whether “the officer’s statements to Ford truly intended to punish Ford for his comments” or, if, instead, they were "efforts to elicit a changed perspective on Ford’s part that would allow the officers to release Ford.” Dissent at 1200. The dissent offers the possibility that "[s]everal of the officer's comments ... can be interpreted as indicating that the officer sought to give Ford an opportunity to change his attitude,” making causation "problematic.” Dissent at 1200-01. We are not persuaded by this nuanced view of the officer’s statements. Police officers are authority figures. Accordingly, there is little practical difference between officers "punishing” Ford for his speech and providing Ford an “opportunity" to conform his views to those of the *1195 police in order to avoid arrest. And even if that were a meaningful distinction, the question whether the officers retaliated against Ford or simply permitted him to retreat voluntarily from his lese-majesté is ultimately a factual one that would have to be resolved at trial.