**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BRIAN BALLENTINE; CATALINO
DAZO; KELLY PATTERSON,
*Plaintiffs-Appellants*,

and

GAIL SACCO,

*Plaintiff*,

v.

CHRISTOPHER T. TUCKER, Detective,
*Defendant-Appellee*,

and

LAS VEGAS METROPOLITAN POLICE
DEPARTMENT; MIKE WALLACE,
Sergeant; JOHN LIBERTY, Lieutenant,
*Defendants*.

No. 20-16805

D.C. No.
2:14-cv-01584-
APG-EJY

OPINION

Appeal from the United States District Court
for the District of Nevada
Andrew P. Gordon, District Judge, Presiding

Argued and Submitted October 21, 2021
San Francisco, California

Filed March 8, 2022

Before:  Mary H. Murguia, Chief Judge, and
J. Clifford Wallace and Carlos T. Bea, Circuit Judges.

Opinion by Judge Wallace

## SUMMARY[*]

### Civil Rights

The panel affirmed in part and reversed in part the district court's summary judgment, on qualified immunity grounds, for Las Vegas Metropolitan Police Department Detective Christopher Tucker in an action brought pursuant to 42 U.S.C. § 1983 alleging, in part, that Tucker violated plaintiffs' First Amendment rights when he arrested them in retaliation for their chalking anti-police messages on sidewalks.

The panel held that Detective Tucker was not entitled to qualified immunity because it was clearly established at the time of plaintiffs' arrests that an arrest supported by probable cause but made in retaliation for protected speech violates the First Amendment.

Citing *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019), the panel first recognized that plaintiffs bringing First Amendment retaliatory arrest claims must generally plead and prove the

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

absence of probable cause because the presence of probable cause generally speaks to the objective reasonableness of an arrest and suggests that the officer's animus is not what caused the arrest. However, the Supreme Court has also carved out a narrow exception for cases where officers have probable cause to make arrests, but typically exercise their discretion not to do so.

Here, plaintiffs presented objective evidence showing that they were arrested while others who chalked and did not engage in anti-police speech were not arrested. Given that plaintiffs had shown differential treatment of similarly situated individuals, the district court correctly concluded that a reasonable jury could find that the anti-police content of plaintiffs' chalkings was a substantial or motivating factor for Detective Tucker's declarations of arrest. Accordingly, the panel agreed with the district court that a reasonable factfinder could conclude from the evidence that Detective Tucker violated plaintiffs' First Amendment rights.

The panel held that at the time of Detective Tucker's conduct in July 2013, binding Ninth Circuit precedent gave fair notice that it would be unlawful to arrest plaintiffs in retaliation for their First Amendment activity, notwithstanding the existence of probable cause. A reasonable officer in Detective Tucker's position had fair notice that the First Amendment prohibited arresting plaintiffs. Accordingly, the district court erred in granting qualified immunity to Detective Tucker.

**COUNSEL**

Devi M. Rao (argued), Roderick & Solange MacArthur Justice Center, Washington, D.C.; Margaret Ann McLetchie and Alina Maria Shell, McLetchie Law, Las Vegas, Nevada; for Plaintiffs-Appellants.

Craig R. Anderson (argued) and Kathleen A. Wilde, Marquis Aurbach Coffing, Las Vegas, Nevada, for Defendant-Appellee.

**OPINION**

WALLACE, Circuit Judge:

Brian Ballentine, Catalino Dazo, and Kelly Patterson (Plaintiffs) appeal from the district court's order granting Detective Christopher Tucker's motion for summary judgment and dismissing Plaintiffs' claims under 42 U.S.C. § 1983 based on qualified immunity grounds. The district court concluded that Detective Tucker is entitled to qualified immunity because Plaintiffs' constitutional rights were not clearly established at the time of their arrests. We have jurisdiction under 28 U.S.C. § 1291. We affirm the district court's holding that a reasonable factfinder could conclude from the evidence that Detective Tucker violated Plaintiffs' First Amendment rights. We reverse the district court's holding that Detective Tucker is entitled to qualified immunity because it was clearly established at the time of Plaintiffs' arrests that an arrest supported by probable cause but made in retaliation for protected speech violates the First Amendment. Accordingly, we affirm in part, reverse in part, and remand.

## I.

Plaintiffs are members of the Sunset Activist Collective, a local activist group, and are associated with CopBlock, an activist group critical of law enforcement. Since 2011, Plaintiffs have conducted protests by using chalk to write anti-police messages on the sidewalks of Las Vegas, Nevada. In response to increased chalking activity and incurred cleaning costs, the City of Las Vegas indicated to the Las Vegas Metropolitan Police Department (Metro) that it was willing to prosecute if Metro observed someone chalking the sidewalks.

On June 8, 2013, Plaintiffs were chalking the sidewalk in front of Metro's headquarters. The messages were critical of police, included references to officer-involved shootings, and spanned approximately 320 square feet. As Sergeant Mike Wallace drove out of the Metro's parking lot, he saw Plaintiffs chalking. He informed Plaintiffs that chalking on the sidewalk was unlawful and asked them to stop. He also indicated that Plaintiffs could continue to protest if they did so lawfully, encouraging them to use signs instead. Plaintiffs responded that chalking on the sidewalk was not illegal. When Plaintiffs refused to stop chalking, Sergeant Wallace decided to issue a citation to each plaintiff for violation of Nevada's graffiti statute, which criminalizes conduct that "places graffiti on or otherwise defaces the public or private property, real or personal, of another, without the permission of the owner." Nev. Rev. Stat. § 206.330.

Plaintiff Patterson then requested to speak with Sergeant Wallace's supervisor. Lieutenant John Liberty responded and came to the scene. On the way, he confirmed with a state court judge, a deputy district attorney, and a detective of internal affairs that sidewalk chalking constituted a crime

under Nevada's graffiti statute. Upon arrival, Lieutenant Liberty informed Plaintiffs that they would not be cited if they cleaned up the sidewalk. He told them that the chalking was illegal, but that they could continue to protest if they used signs instead, and that the city was tired of protestors using chalk and leaving it to the city to pay for cleanup. Plaintiffs again responded that under Nevada case law, chalking is not illegal. When Plaintiffs refused to clean the messages, Sergeant Wallace issued the citations.

Detective Tucker, a Metro officer, was assigned to investigate the citations. As part of the investigation, Detective Tucker examined Plaintiffs' messages and monitored Plaintiffs' social media to track their activities, consistent with his practice in cases involving graffiti. Through Plaintiffs' social media activities, Detective Tucker learned that Plaintiffs were members of the Sunset Activist Collective and were associated with CopBlock.

On July 13, 2013, Plaintiffs Ballentine and Patterson again chalked messages critical of Metro on the sidewalks outside Metro's headquarters. At least one officer witnessed them chalking, but no officers talked with or cited them. The cost to clean up the chalk, which spanned approximately 240 square feet, was $300.

On July 18, 2013, Plaintiffs appeared at the Regional Justice Center, the local state courthouse, for their hearing on the June 8 citations. The citations were not prosecuted. Following the hearing, Plaintiffs chalked messages critical of Metro and police on the sidewalk in front of the courthouse. These messages included the statements, "FUCK PIGS!" and "FUCK THE COPS." The chalking spanned approximately 1,000 square feet, and the cleanup cost was approximately $1,250.

Detective Tucker was present at the courthouse while Plaintiffs chalked, and he photographed the messages. After recognizing Ballentine from his investigation, he asked if Plaintiffs were going to clean up after themselves. Ballentine did not respond. Detective Tucker also told Plaintiffs that one of their messages was inaccurate—the chalking stated that no Metro officer had ever been prosecuted for murder, which he said was false. In the end, Detective Tucker did not stop Plaintiffs or cite them, and no officer told Plaintiffs to stop chalking. Plaintiffs also indicated that no efforts were made to stop other individuals, including children, from chalking that day.

Subsequently, on July 26, 2013, Detective Tucker issued declarations of arrest for Plaintiffs' July 13 and July 18 chalkings. In the declarations, Detective Tucker referred to Plaintiffs' association with the Sunset Activist Collective and CopBlock. He also specified the content of some of their messages, including "FUCK PIGS!" and "FUCK THE COPS."

On August 9, 2013, a criminal complaint was filed against Plaintiffs for conspiracy to commit placing graffiti and placing graffiti on or otherwise defacing property. The complaint referred to the graffiti as derogatory and profane. The next day, Plaintiffs Ballentine and Patterson were arrested at another planned protest. The Clark County District Attorney ultimately dropped all charges because officers that were present at the courthouse did not tell Plaintiffs to stop, while some officers also possibly told Plaintiffs where they could and could not chalk, and the district attorney concluded prosecutions were not a good use of limited resources.

Plaintiffs responded by filing an action against individual officers Tucker, Wallace, and Liberty, as well as

Metro, asserting claims pursuant to 42 U.S.C. § 1983 and Nevada law. The district court entered summary judgment for defendants on all claims except Plaintiffs' claim that Detective Tucker violated their First Amendment rights by arresting them in retaliation for chalking anti-police messages on sidewalks. Detective Tucker appealed from the district court's denial of summary judgment, and we issued a memorandum disposition vacating and remanding the case in light of the Supreme Court's decision in *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019). *See Ballentine v. Las Vegas Metro. Police Dep't*, 772 F. App'x 584, 585 (9th Cir. 2019).

On remand, Detective Tucker again moved for summary judgment on the ground that he was entitled to qualified immunity. The district court granted the motion. Although the district court held that a reasonable jury could find that Detective Tucker violated the Plaintiffs' First Amendment rights, it concluded that Detective Tucker is still entitled to qualified immunity because the right to be free from retaliatory arrest notwithstanding probable cause was not clearly established when he issued declarations for Plaintiffs' arrests. Plaintiffs timely appealed.

## II.

We review a district court's summary judgment based on qualified immunity de novo. *See Evans v. Skolnik*, 997 F.3d 1060, 1064 (9th Cir. 2021). "Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) (en banc). "Summary judgment [based] on qualified immunity is not proper unless the evidence permits only one reasonable conclusion." *Munger*

*v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1087 (9th Cir. 2000).

"In § 1983 actions, qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sampson v. County of Los Angeles*, 974 F.3d 1012, 1018 (9th Cir. 2020), *quoting Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation marks omitted). Therefore, to overcome qualified immunity, Plaintiffs must show that Detective Tucker (1) "violated a federal statutory or constitutional right" and (2) "the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quotation marks omitted). The two elements do not need to be analyzed in any specific order, and courts are permitted to "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first . . . ." *Pearson*, 555 U.S. at 236.

III.

First, we agree with the district court that a reasonable factfinder could conclude from the evidence that Detective Tucker violated Plaintiffs' First Amendment rights. "Under the first prong [of the qualified immunity inquiry,] we ask whether, '[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?'" *Acosta v. City of Costa Mesa*, 718 F.3d 800, 824 (9th Cir. 2013), *quoting Saucier v. Katz*, 533 U.S. 194, 201 (2001).

> The First Amendment forbids government officials from retaliating against individuals for speaking out. To recover under § 1983

for such retaliation, a plaintiff must prove: (1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action.

*Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010) (citations omitted). The district court held that the first two elements were satisfied, and Detective Tucker does not contend otherwise. The only element in dispute is whether there was causation.

To evaluate whether there is a constitutional violation, we apply the current law. *See Sandoval v. County of San Diego*, 985 F.3d 657, 678 (9th Cir. 2021). Accordingly, the retaliatory arrest framework stated by the Supreme Court in *Nieves* governs here. *See Nieves*, 139 S. Ct. at 1723–24. In *Nieves*, the Court held that plaintiffs bringing "First Amendment retaliatory arrest claims" must generally "plead and prove the absence of probable cause," because the presence of probable cause generally "speaks to the objective reasonableness of an arrest" and suggests that the "officer's animus" is not what caused the arrest. *Id.*

However, the Supreme Court also carved out a "narrow" exception for cases where "officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Id.* at 1727. For example, "[i]f an individual who has been vocally complaining about police conduct is arrested for jaywalking"—an offense that "rarely results in arrest"— "it would seem insufficiently protective of First Amendment

rights to dismiss the individual's retaliatory arrest claim on the ground that there was undoubted probable cause for the arrest." *Id.* To be sure, the *Nieves* exception applies only "when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* Showing "differential treatment addresses [the] causal concern by helping to establish that non-retaliatory grounds [we]re in fact insufficient to provoke the adverse consequences." *Capp v. County of San Diego*, 940 F.3d 1046, 1056 (9th Cir. 2019), *quoting Nieves*, 139 S. Ct. at 1727 (quotation marks omitted).

Detective Tucker contends that Plaintiffs' claims do not fall within the *Nieves* exception because the evidence does not support their allegations that they were singled out based on a retaliatory motive. But Plaintiffs presented objective evidence showing that they were arrested while others who chalked and did not engage in anti-police speech were not arrested. During discovery, Metro produced records indicating only two instances in which chalkers were suspected of or charged with violating Nevada's graffiti statute. In these two instances, only one individual was cited—not arrested—for chalking on public property. There is no evidence that anyone besides the Plaintiffs has been arrested for chalking on the sidewalk. Additionally, the Plaintiffs presented evidence that other individuals chalking at the courthouse at the same time as Plaintiffs were not arrested. This is the kind of "objective evidence" required by the *Nieves* exception to show that a plaintiff was "arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves*, 139 S. Ct. at 1727.

Plaintiffs' showing of differential treatment is further supported when considering the jaywalking example provided in *Nieves*. If chalking on sidewalks violates Nevada law, committing the offense in Las Vegas is much like jaywalking in that both are offenses for which "officers have probable cause to make arrests, but typically exercise their discretion not to do so." *See id.* Metro records show that chalking "rarely results in arrest," *id.* Indeed, Plaintiffs' own experiences confirm this. Between 2011 and 2013, Plaintiffs attended at least nine chalking protests. At these protests, no law enforcement officers cited the Plaintiffs or told them that chalking on the city sidewalk was illegal. On one occasion in 2012, marshals affirmatively permitted Plaintiffs to chalk messages on the sidewalk in front of the courthouse. During the July 13 and July 18 chalking incidents, no officers stopped or cited Plaintiffs. Similar to jaywalking, if chalking constitutes an offense, it is an offense for which "probable cause does little to prove or disprove the causal connection between animus and injury." *See id.* Thus, Plaintiffs have shown differential treatment of similarly situated individuals, satisfying the *Nieves* exception.

Detective Tucker offers countervailing explanations for his decision to seek arrest warrants. For example, he argues that lesser options failed because Plaintiffs continued to chalk despite the June 8 citations and efforts to talk with Plaintiffs and encourage alternative protests did not have any impact. Detective Tucker also contends that he engaged in good police work by detailing Plaintiffs' association with anti-police groups and the content of the messages, including "FUCK PIGS!" and "FUCK THE COPS," in the declarations of arrest. Providing this information, Detective Tucker contends, allows the judge to evaluate First Amendment concerns.

However, "[t]he possibility that other inferences could be drawn [regarding the officers' motivations] that would provide an alternate explanation for the [officers'] actions does not entitle them to summary judgment." *Mendocino Env't Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1303 (9th Cir. 1999). This issue is for the trier of fact, not for us, to resolve. *See Ford v. City of Yakima*, 706 F.3d 1188, 1194 (9th Cir. 2013) ("[T]he issue of causation ultimately should be determined by a trier of fact."), *abrogated in part by Nieves*, 139 S. Ct. 1715. Here, the trier of fact, as the district court observed, could very well "credit" or "disbelieve" Detective Tucker's explanations. Dist. Ct. Dkt. No. 237 at 9–10. Certainly, there is at least a genuine dispute of material fact for Plaintiffs to survive summary judgment, as the evidence does not "permit[] only one reasonable conclusion," *Munger*, 227 F.3d at 1087.

In addition to showing the absence of probable cause or the applicability of the exception, the "plaintiff must show that the retaliation was a substantial or motivating factor behind the [arrest], and, if that showing is made, the defendant can prevail only by showing that the [arrest] would have been initiated without respect to retaliation." *Nieves*, 139 S. Ct. at 1725, 1727 (citation omitted).

On this point, the district court correctly concluded that a reasonable jury could find that the anti-police content of Plaintiffs' chalkings was a substantial or motivating factor for Detective Tucker's declarations of arrest. Detective Tucker knew that Plaintiffs were activists that were vocally critical of the police. *Cf. Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1954 (2018) (stating that plaintiff "likely could not have maintained a retaliation claim against the arresting officer" where there was "no showing that the officer had any knowledge of [plaintiff's] prior speech or

any motive to arrest him for his earlier expressive activities"). Detective Tucker had previously engaged with Plaintiffs, challenging a chalked message that indicated no Metro officer had ever been prosecuted for murder. In the declarations of arrest, he explicitly included Plaintiffs' association with anti-police groups and the critical content of their messages. Moreover, rather than cite Plaintiffs—which the evidence showed was an extremely rare occurrence to begin with—Detective Tucker sought arrest warrants. Coupled with the evidence of differential treatment already discussed, a reasonable jury could find that the anti-police content of Plaintiffs' chalkings was a substantial or motivating factor for effecting the arrest.

The burden then shifts to Detective Tucker, who can prevail only by showing that the arrests would have occurred regardless of Plaintiffs' anti-police speech. *See Nieves*, 139 S. Ct. at 1722, 1727. A reasonable jury could credit Detective Tucker's explanations that he arrested Plaintiffs because the June 8 citations were not a sufficient deterrent, and that he included the content of the speech and Plaintiffs' affiliations in the declarations of arrest to allow the judge to evaluate potential First Amendment implications. But a reasonable jury could also find that Detective Tucker would not have sought arrest warrants in the absence of Plaintiffs' anti-police activities. Viewing the evidence and drawing all reasonable inferences in the favor of Plaintiffs, a jury could conclude that Detective Tucker violated Plaintiffs' First Amendment rights. Accordingly, Plaintiffs have raised a genuine dispute of material fact as to whether their constitutional right was violated and have satisfied one part of the qualified immunity inquiry.

IV.

A government officer is nevertheless entitled to qualified immunity if the plaintiff's rights were not clearly established at the time of the alleged misconduct. *See Pearson*, 555 U.S. at 231–32. "To be 'clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Acosta*, 718 F.3d at 824, *quoting Anderson v. Creighton*, 483 U.S. 635, 639 (1987). While there need not be "a case directly on point, [] existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Under this inquiry, we look first to binding precedent. "If the right is clearly established by decisional authority of the Supreme Court or this Circuit, our inquiry should come to an end." *Boyd v. Benton Cnty.*, 374 F.3d 773, 781 (9th Cir. 2004).

Whether a right is clearly established "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." *Anderson*, 483 U.S. at 639. The Supreme Court has "repeatedly stressed that courts must not 'define clearly established law at a high level of generality.'" *Wesby*, 138 S. Ct. at 590, *quoting Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014).

To determine if a right was clearly established, "[t]he relevant inquiry is whether, at the time of the officers' action, the state of the law gave the officers fair warning that their conduct was unconstitutional." *Ford*, 706 F.3d at 1195, *citing Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Accordingly, we look to the state of the law that concerned conduct at the time of the challenged police action.

At the outset, Detective Tucker argues that the law was not clearly established at the time of his conduct in 2013

because the Supreme Court's decision in *Nieves* did not clarify the appropriate standard for First Amendment retaliation claims until 2019. But a right can also be clearly established by this circuit's precedent. *See Boyd*, 374 F.3d at 781.

Contrary to Detective Tucker's characterization of Plaintiffs' claims, Plaintiffs did not merely "describe the 'clearly established' right in general terms like 'retaliatory law enforcement action.'" Dkt. No. 19 at 28. Rather, Plaintiffs defined the right as "the right to be free from retaliatory law enforcement action *even when probable cause existed for that action*." Dkt. No. 12 at 13 (emphasis added). In so doing, Plaintiffs defined the right as we did in *Skoog* and *Ford*. *See Skoog v. County of Clackamas*, 469 F.3d 1221, 1235 (9th Cir. 2006) ("In this case, we define the right as the right of an individual to be free of police action motivated by retaliatory animus but for which there was probable cause."), *abrogated in part by Nieves*, 139 S. Ct. 1715; *Ford*, 706 F.3d at 1195–96 ("[T]his Court's 2006 decision in *Skoog* established that an individual has a right to be free from retaliatory police action, even if probable cause existed for that action.").[1]

Thus, at the time of Detective Tucker's conduct in July 2013, binding Ninth Circuit precedent gave fair notice that it would be unlawful to arrest Plaintiffs in retaliation for their First Amendment activity, notwithstanding the existence of

---

[1] *Nieves* abrogated *Ford* and *Skoog* to the extent those cases held that a plaintiff can prevail on a First Amendment retaliatory arrest claim regardless of whether probable cause existed for the arrest. A plaintiff either "must plead and prove the absence of probable cause for the arrest" or that the offense at issue is one for which "officers have probable cause to make arrests, but typically exercise their discretion not to do so." *See Nieves*, 139 S. Ct. at 1721–28.

probable cause.    The right was first established in our November 2006 decision in *Skoog*, which held that a First Amendment "right exists to be free of police action for which retaliation is a but-for cause even if probable cause exists for that action." 469 F.3d at 1235.    Then, our February 2013 decision in *Ford* held that by July 2007, in light of *Skoog*, it was clearly established law in this circuit that there is a "First Amendment right to be free from police action motivated by retaliatory animus, even if probable cause existed for that action."    706 F.3d at 1195–96.    Because Detective Tucker's conduct occurred in July 2013, the right had been clearly established by *Skoog*.

Detective Tucker argues that our decision in *Acosta*, 718 F.3d at 806, created uncertainty as to the state of the law. But Detective Tucker misunderstands *Acosta*.    There, police arrested Acosta in January 2006 for violating a municipal ordinance prohibiting disorderly conduct at city council meetings.    *Id.* at 806–08.    We correctly concluded that "at the time of the Council meeting," there was no clearly established right to be free from a retaliatory arrest otherwise supported by probable cause.    *Id.* at 825.    This was so because the panel in *Acosta* was required to examine the law "at the time of the challenged conduct" in January 2006, *see id.* at 824–26, which pre-dated *Skoog* and *Ford*.    Since *Acosta* only addressed the state of the law in January 2006, it has no effect on the state of the law in July 2013, the time of Detective Tucker's conduct.    Neither *Skoog* nor *Ford* had any place in the *Acosta* inquiry.    In contrast, by the time of Detective Tucker's conduct in 2013, *Skoog* had clearly established the right.    That the decision in *Acosta* was issued in 2013 is therefore irrelevant because the decisive inquiry is the state of the law at the time of the challenged conduct.

The district court, however, concluded that the right was not clearly established because of our unpublished decision in *Bini v. City of Vancouver*, 745 F. App'x. 281 (9th Cir. 2018). There, the majority held that at the time of Bini's first arrest in 2014, "it was not clearly established in this circuit that an arrest supported by probable cause, but made in retaliation for protected speech, violated the Constitution." *Id.* at 282. In so holding, the majority stated, "we held in *Ford* . . . —more than a year before Bini's first arrest in 2014—that such a right was clearly established in this circuit. But a month later [in *Acosta*] we held that the same right had *not* been clearly established." *Id.* (citations omitted).

But *Bini* does not change our analysis. First, as an unpublished memorandum disposition, *Bini* does not bind this panel. *See* 9th Cir. R. 36-3(a). Second, the *Bini* majority erred by relying on the dates of the *Ford* and *Acosta* decisions, rather than the dates of the challenged conduct. As we discussed above, *Acosta* examined the state of the law in January 2006, *before* the right was clearly established by *Skoog* and *Ford*. The *Bini* dissent correctly recognized that *Acosta* was "determining the state of the law as it stood in 2006, when Acosta was arrested. The decision has nothing to say about the state of the law in 2014, when Bini was arrested." 745 F. App'x at 283 (Watford, J., dissenting in part) (citation omitted). Thus, by the time of Bini's arrest in 2014, "*Ford* had resolved whatever uncertainty remained in our circuit's case law." *Id.* Likewise, here, by the time of Plaintiffs' arrests in 2013, *Skoog* and *Ford* had clearly established the right.

To summarize, in November 2006, *Skoog* established the First Amendment right to be free from retaliatory law enforcement action even where probable cause exists.

469 F.3d at 1235. *Ford* subsequently held that *Skoog* clearly established this right in November 2006. 706 F.3d at 1195–96. *Acosta*, which examined the state of the law in January 2006—before *Skoog* and *Ford* were decided—is irrelevant to the state of the law in question here. *See Acosta*, 718 F.3d at 808, 825–26. Accordingly, at the time of Detective Tucker's conduct in July 2013, the right was clearly established.

Finally, Detective Tucker argues that the facts of then-existing case law are distinguishable from the facts of this case. But "[a] right can be clearly established despite a lack of factually analogous preexisting case law, and officers can be on notice that their conduct is unlawful even in novel factual circumstances." *Ford*, 706 F.3d at 1195; *see also Ioane v. Hodges*, 939 F.3d 945, 956 (9th Cir. 2018) (a plaintiff "need not identify a prior identical action to conclude that [a] right is clearly established" (citation omitted)). Thus, "[t]he question is not whether an earlier case mirrors the specific facts here. Rather, the relevant question is whether 'the state of the law at the time gives officials fair warning that their conduct is unconstitutional.'" *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1064 (9th Cir. 2013) (citation omitted).

Moreover, Detective Tucker's attempts to distinguish the facts of this case from prior precedent fail. For example, he contends that *Skoog* stands only for the "proposition that an officer violates the First Amendment when he performs an official act pursuant to a warrant supported by weak probable cause and where there is substantial evidence of a retaliatory motive." Dkt. No. 19 at 34. He claims *Skoog* is distinguishable because Detective Tucker presented a detailed warrant, including the content of the speech, that was supported by probable cause. But we have never

construed *Skoog* so narrowly. On the contrary, we have concluded that any reasonable officer would understand that police action "falls squarely within the prohibition[] of . . . *Skoog*" where it is "motivated by retaliatory animus, even if probable cause existed for that action." *Ford*, 706 F.3d at 1196. The fact that Detective Tucker presented a detailed warrant supported by probable cause does not render *Skoog* inapposite.

Detective Tucker also argues that *Ford* is distinguishable. There, a Section 1983 plaintiff brought a retaliatory arrest claim against officers who arrested him following a traffic stop. *See id.* at 1190. Ford presented evidence that the officers arrested him because he yelled at them during the stop and accused them of making a racially motivated stop. *See id.* at 1190–91. By contrast, Detective Tucker argues he presented all of the evidence—including the content of the speech—to a neutral magistrate after he "completed a thorough investigation, sought input from others, and made a calm decision after lesser alternatives failed to deter Plaintiffs' behavior." Dkt. No. 19 at 36. Although the evidence of Detective Tucker's alleged retaliatory animus may not be so overt as that in *Ford*, the conflicting evidence is sufficient for a reasonable jury to conclude that Detective Tucker's conduct was retaliatory, notwithstanding a "thorough" and "calm" investigation. But it is the role of the trier of fact, not us, to weigh the strength of the evidence of retaliatory animus.

Even so, "officers can be on notice that their conduct is unlawful even in novel factual circumstances." *Ford*, 706 F.3d at 1195. Where a case "involve[s] the kind of mere application of settled law to a new factual permutation," "we assume an officer had notice that his conduct was unlawful." *Id.* at 1196 (citation and quotation marks omitted). By the

time of Detective Tucker's conduct, Ninth Circuit precedent had long provided notice to officers that "an individual has a right to be free from retaliatory police action, even if probable cause existed for that action." *Id.* at 1195–96. Detective Tucker's belief that his conduct was not unlawful because he thoroughly investigated and made the decision to arrest after lesser alternatives failed does not vitiate such notice. A reasonable officer in Detective Tucker's position had fair notice that the First Amendment prohibited arresting Plaintiffs for the content of their speech, notwithstanding probable cause. Accordingly, the district court erred in granting qualified immunity to Detective Tucker.

**AFFIRMED in part, REVERSED in part, and REMANDED.**